NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


TODD KOZEL,                              )
                                         )
            Appellant,                   )
                                         )
v.                                       )      Case No. 2D15-4364
                                         )
ASHLEY D. KOZEL,                         )
                                         )
            Appellee.                    )
_____)

Opinion filed November 27, 2019.

Appeal from the Circuit Court for Sarasota
County; Nancy K. Donnellan, Judge.

Christopher N. Bellows and Rodolfo
Sorondo, Jr., of Holland & Knight LLP,
Miami (withdrew after briefing); John G.
Crabtree, Charles M. Auslander, and
Brian C. Tackenberg of Crabtree &
Auslander, Key Biscayne (substituted as
counsel of record); and Raoul G. Cantero
and Jesse L. Green of White & Case, LLP,
Miami, for Appellant.

Steven L. Brannock, Philip J. Padovano,
and Joseph T. Eagleton of Brannock &
Humphries, Tampa; and Jeffrey D. Fisher
and Zachary Potter of Fisher Potter Hodas,
PLLC, West Palm Beach, for Appellee.

SALARIO, Judge.

This case presents difficult questions about a trial court's continuing jurisdiction after entry of a final judgment to enforce a settlement agreement. Todd Kozel, the former husband, and Ashley Kozel, the former wife, entered into a property settlement agreement to resolve a divorce case. The former husband agreed to transfer shares of stock to the former wife by a date certain and to give her information to determine her tax obligations when she sold it. The family court incorporated the agreement into a final judgment of dissolution of marriage and retained jurisdiction to enforce it. The former husband was late in delivering the stock to the former wife, and the tax information he gave her was wrong.

Invoking the trial court's continuing jurisdiction to enforce the agreement, the former wife filed papers seeking relief from the family court. Although her filings were styled as petitions to enforce the agreement, they alleged what amounted to claims for money damages for alleged breaches of contract. After granting partial summary judgment on liability and holding a nonjury trial on damages, the family court found the former husband in breach and awarded the former wife (1) $34,611,702 as damages based on the failure to deliver the stock on time and (2) $3,850,500 as damages for the breach of the obligation to provide tax information. The sum and substance on appeal is this: A trial court's continuing jurisdiction to enforce a settlement agreement generally does not include jurisdiction to award damages for breach that are not specified in the agreement, and the agreement here did not specify the damages the former wife sought and the family court awarded. We reverse the family court's award of damages to the former wife—together with an injunction intended to secure the payment of those amounts—and affirm the balance of the final judgment.

***The History and Relevant Terms of the Property Settlement Agreement***

The former husband and former wife were married in 1992, and the former wife filed a petition for dissolution of marriage in 2010. The former husband is the chief executive officer of Gulf Keystone Petroleum, Ltd., an oil and gas exploration company. When the parties divorced, much of their shared and substantial wealth consisted of Gulf Keystone stock, which is publicly traded on the AIM Stock Exchange in London.

The parties settled the divorce case. A substantial chunk of the consideration was to consist of Gulf Keystone stock that the former husband was to transfer to the former wife as equitable distribution. The parties—both savvy people in their own rights and both represented by capable counsel—documented their understanding in a Property Settlement Agreement (PSA) dated January 12, 2012.

The former husband's obligation to transfer the Gulf Keystone stock to the former wife was regulated, in the main, by paragraphs 6 and 7 of the agreement. Paragraph 6A obligated the former husband to deliver to the former wife, as equitable distribution, twenty-three million shares of stock on or before January 27, 2012. Upon delivery, the former wife would be free to sell the stock to anyone at any time.

Paragraph 7 of the agreement, titled "Remedies Upon Default," spelled out what would happen if the former husband failed to deliver the shares. As relevant here, paragraph 7A provided as follows:

> In the event that the Husband does not transfer to the Wife all or any portion of the 23 million shares of GKP common stock and/or the shares are transferred, but are not in full compliance with Paragraph 6A above . . . then for each day, starting on [January 28, 2012], that the Husband has not fully and completely satisfied all of the terms and conditions of Paragraph 6A, <u>he shall be in default and he shall owe the Wife payments as and for additional equitable distribution at the rate of 6% per annum (calculated simply and not</u>

compounding) on the value of the 23 million Shares, or any portion thereof as determined from time to time, which are not transferred in compliance with Paragraph 6A above . . . .

(Emphasis added.) Paragraph 7A calls the interest payments the former husband would be required to make in the event he failed to deliver the shares "Additional Equitable Distribution," and it says that the former husband's obligation to make additional equitable distribution payments if and when required is immediately "enforceable by contempt and any other remedy at law or in equity."

Paragraph 7A then goes on to state:

In addition, should Husband fail to fully comply with paragraph 6A above with regard to all 23 million Shares on or before the close of business 5:00 p.m. EST on May 1, 2012, but he has timely paid the Additional Equitable Distribution payments described herein, then on May 1, 2012, the Wife may move the court to hold the Husband in contempt or to otherwise compel him to specifically perform and/or transfer to her all 23 million Shares in compliance with paragraph 6A, or for any other remedy at law or in equity including, but not limited to, a money judgment. Nothing contained in this Agreement, or paragraph 7 thereof, shall be construed to limit or restrict the Wife's right to seek or pursue all remedies at law and in equity to enforce her rights to receive the 23 million Shares and/or the value thereof in accordance with paragraph 6A.

(Emphasis added.) In sum, then, paragraph 7A said that in the event of a default on the former husband's obligation to deliver the shares: (1) that the former husband would be required to pay additional equitable distribution, an obligation the former wife could immediately enforce using contempt or any other remedy; (2) that if the former husband paid the additional equitable distribution but failed to deliver the shares by close of business on May 1, 2012, the former wife could file a motion in the family court for contempt or for legal and equitable remedies, including a money judgment; and (3) that nothing in paragraph 7 of the agreement limited or restricted the former wife's right to

- 4 -

seek any legal or equitable remedies for the former husband's failure to deliver the stock as required.

Also relevant with respect to the payment of additional equitable distribution, paragraph 7B of the agreement provided that the former husband

> shall be entitled to a full or partial refund of those . . . payments if, and only if, he (1) timely pays the Additional Equitable Distribution payments and (ii) <u>cures the [stock delivery] default</u> within 120 days from the date the default occurred, and (iii) <u>on the date the default is cured</u>, the price of the GKP Shares in default exceeds the price of the GKP Shares on [January 28, 2012] . . . .

(Emphasis added.)

Paragraph 15 of the PSA also addressed various tax matters arising from the dissolution of the parties' marriage and the transactions contemplated by their agreement. To enable the former wife to determine and satisfy her tax obligations with respect to any sale of the Gulf Keystone stock she was to receive, paragraph 15 obligated the former husband to provide the former wife with a document "setting forth the [former husband's] tax basis and the holding period (as of the date of the transfer to the wife)" of the stock he was delivering "as well as documentation establishing such tax basis and holding period sufficient to allow the Wife to properly report any gains or losses" to the Internal Revenue Service.

Finally, as relevant here, the PSA contains some general provisions concerning remedies. Paragraph 20 says that the agreement would be incorporated into a final judgment to be entered by the family court and would be "fully enforceable as an order and/or Final Judgment of the court." It further provided:

> Notwithstanding incorporation in the Final Judgment of Divorce, this Agreement shall not be merged in it, but shall survive the Final Judgment and shall be binding on the

- 5 -

Parties for all time. The Parties agree that so long as one of them continues to reside in the State of Florida, the courts of the State of Florida shall retain jurisdiction for purposes of enforcing this Agreement and that venue will lie in the county where the Florida resident then resides. . . . Each party has the right to enforce and/or defend this Agreement utilizing all legal and/or equitable remedies including, but not limited to, contract remedies, judgment remedies, and all other remedies at law or in equity.

The parties presented the agreement to the family court, which entered a final judgment of dissolution of marriage. The final judgment ordered the parties to comply with the terms of the agreement and provided that the family court "retains jurisdiction over the subject matter of this cause . . . to enforce this Final Judgment . . . and to grant such other relief as is appropriate."

### The Former Wife Seeks Relief for Alleged Breaches of the PSA in the Family Court

The former husband did not deliver twenty-three-million shares of Gulf Keystone stock to the former wife by January 27, 2012. Instead, he transferred the stock to her in four batches at later dates: (1) 2,034,447 shares on January 30, 2012; (2) 3,798,886 shares on February 3, 2012; (3) 5,666,667 shares on February 21, 2012; and (4) 11,600,000 shares on March 1, 2012. While the former husband was in default for failure to timely deliver the stock, he made all of the additional equitable distribution payments required by paragraph 7A of the agreement. Ultimately, he delivered all of the stock on or before May 1, 2012, the date upon which paragraph 7A said the former wife could file a motion in the family court seeking, among other things, contempt, a "money judgment," and any other remedy at law or in equity. The former wife was required to refund the additional equitable distribution payments to the former husband because the value of the stock on the dates the former husband delivered the stock

- 6 -

exceeded its value on January 27, 2012, the original date set for complete delivery of the shares, by more than $29 million.

The former husband also provided the former wife a letter stating his tax basis in the stock. It turned out, however, that the information was inaccurate with respect to the 5,666,667 shares transferred on February 21, 2012. After receiving professional advice, the wife paid an additional $3.8 million in tax to the Internal Revenue Service after selling those shares.

On November 28, 2012—eight months after the final transfer of stock—the former wife filed in the family court a document titled "Former Wife's Supplemental Petition And/Or Motion For An Award Of Damages Arising From Former Husband's Breach of Property Settlement Agreement." In it, she alleged that the former husband breached the agreement by failing to timely deliver the stock as required by paragraph 6A and that he did so in order to trade the stock for his own benefit. She further alleged that the late delivery of the stock "caused [her] to suffer substantial damages" because it denied her an opportunity to sell the stock at a time when market conditions were favorable. She prayed for "appropriate legal and/or equitable relief that will make her whole and will disgorge any improper profits made by the former husband."

The former husband responded that the family court lacked jurisdiction to consider the former wife's claim. Relying on the supreme court's decision in Paulucci v. General Dynamics Corp., 842 So. 2d 797, 803 (Fla. 2003), he alleged that the court lacked jurisdiction to consider what amounted to a claim for general damages for breach of contract. Shortly thereafter, the former wife amended her petition, styling it as one to "enforce" the agreement. She alleged that the court had jurisdiction to enforce the PSA through an award of damages for losses that she allegedly incurred as a result of the

- 7 -

former husband's failure to deliver the stock timely. She later filed a second amended petition that included allegations that the former husband had also breached the agreement by providing inaccurate tax basis information and seeking legal and equitable remedies for that breach as well.

The parties filed cross-motions for summary judgment, with the former wife seeking partial summary judgments on liability on what had become known as the "delayed delivery" and "tax basis" claims and the former husband seeking summary judgment on the ground that the trial court lacked jurisdiction and that he had no liability on the merits. The trial court granted partial summary judgment to the former wife on both the delayed-delivery and tax-basis claims and denied the former husband's summary judgment motions. The case proceeded to a three-day nonjury trial.

The former wife's case at trial focused on the damages caused by the former husband's breaches of the PSA. With respect to the delayed-delivery claim, she presented an expert economist who assessed her damages under the Madison Fund[1] rule—a methodology some courts have used to determine benefit-of-the-bargain damages in a case involving the breach of a contract to deliver stock. Without getting too bogged down in details, the methodology essentially involved determining the former wife's damages by reference to potentially reasonable transactions in which she could have sold the stock had it been timely delivered and the prices and quantities at which she could have made those transactions. The expert opined that under the Madison Fund rule, the former wife had suffered benefit-of-the-bargain damages somewhere in a range of $19.6 million to $45.2 million.

---

[1]Madison Fund, Inc. v. The Charter Co., 427 F. Supp. 597 (S.D.N.Y. 1977).

- 8 -

On the tax-basis claim, the former wife presented expert testimony as to the amount of her unpaid tax liability and showed that it was unlikely that the former wife could get that payment back in a refund action. The former wife argued that the former husband should be required to provide corrected tax-basis information and to pay her the $3.8 million she later paid the IRS. Although the former wife was unclear about the contractual basis for the monetary component of her request, she argued that the agreement granted the family court the power to devise an appropriate legal or equitable remedy, and she also stated that she was prepared to hold the $3.8 million in escrow pending the resolution of a refund request by the IRS.

### The Family Court's Order and the Issues on Appeal

The family court rendered an amended final order in which it held that it had jurisdiction over the former wife's claims and, consistent with its summary judgment rulings, that the former husband breached the stock-delivery and tax-basis provisions of the agreement. On the delayed-delivery claim, it awarded the former wife $34,611,702. On the tax-basis claim, it awarded $3,850,500, to be placed in escrow (presumably pending the outcome of a refund request to the IRS).

In this timely appeal, the former husband raises five issues, all of which are related to the monetary remedies the family court awarded. First, he asserts that because he cured his failure to deliver the stock timely by making full delivery before May 1, 2012, and by making the required additional equitable distribution payments, the former wife had no entitlement to damages on the delayed-delivery claim. Second, he argues that the family court lacked jurisdiction to award damages for delayed delivery of the stock in a postjudgment proceeding because the law requires such a claim to be maintained in a separate action. Third, he maintains that the family court's use of the

Madison Fund methodology to determine the former wife's delayed-delivery damages was inconsistent both with the terms of the agreement and Florida law governing benefit-of-the-bargain damages in the context of late-delivered stock. Fourth, he contends that the family court had no jurisdiction to award damages for breach of the tax-basis provision of the agreement in a postjudgment proceeding as distinguished from a separate action. And finally, he challenges an asset freeze injunction entered by the family court to secure his payment of the monetary awards. We find the second and fourth points concerning the family court's jurisdiction dispositive of the monetary remedies, reverse the final judgment to the extent it awarded those remedies and an injunction to secure their payment, and affirm the balance of the amended judgment because it is not challenged here.

### *The Scope of the Family Court's Continuing Jurisdiction*

The parties and the family court addressed the jurisdictional issues in this case as relating to the family court's "subject matter jurisdiction." As more modern Florida decisions frame it, however, the issues may more appropriately be considered ones that involve the family court's "continuing jurisdiction." See Paulucci, 842 So. 2d at 801 n.3 (citing Finkelstein v. N. Broward Hosp. Dist., 484 So. 2d 1241, 1243 (Fla. 1986)); McBride v. McBride, 549 So. 2d 787, 788 (Fla. 2d DCA 1989) (discussing a family court's "continuing jurisdiction" to award attorneys' fees). The difference the cases posit is this: Subject matter jurisdiction refers to a trial court's constitutional or statutory authority to decide a class of cases, while continuing jurisdiction refers to a trial court's jurisdiction to act in a case over which it had subject matter jurisdiction, but which it finally resolved with the entry of a judgment. See Paulucci, 842 So. 2d at 801 n.3; 14302 Marina San Pablo Place SPE, LLC v. VCP-San Pablo, Ltd., 92 So. 3d 320,

321 (Fla. 1st DCA 2012) (Ray, J., concurring) (describing the difference between subject matter jurisdiction and continuing jurisdiction).

When a trial court renders a final judgment in an action, its jurisdiction over that action is terminated, except that it retains continuing jurisdiction to enforce its judgment.  See Davidson v. Stringer, 147 So. 228, 229 (Fla. 1933) (stating that when a judgment becomes final "the jurisdiction of the court is exhausted, and it cannot take any further proceedings in the case"); Volume Servs. Div. of Interstate United Corp. v. Canteen Corp., 369 So. 2d 391, 394 (Fla. 2d DCA 1979) (stating that "once a judgment becomes final, the court ordinarily loses jurisdiction to entertain further proceedings"). In the family law context, this principle is subject to exceptions rooted in what, for lack of a better description, might be called the continuing nature of family cases.  See, e.g., Loza v. Marin, 198 So. 3d 1017, 1021 (Fla. 2d DCA 2016) (discussing continuing jurisdiction to modify a child support award under section 61.13, Florida Statutes); Mouton v. Mouton, 590 So. 2d 40, 41 (Fla. 2d DCA 1991) (en banc) (discussing continuing jurisdiction to modify an alimony award under section 61.14).  But where these exceptions do not apply—and no one has argued that they do in this case—the principle that a court's rendition of a final judgment terminates its jurisdiction except with regard to enforcement also applies in family law cases.  See, e.g., Damian v. Damian, 955 So. 2d 1178, 1180 (Fla. 2d DCA 2007) (holding that a family court exceeded its jurisdiction to enforce a final judgment of dissolution where it modified rather than enforced that agreement); Rocha v. Mendonca, 35 So. 3d 973, 976 (Fla. 3d DCA 2010) (holding that a family court lacked continuing jurisdiction to afford remedies not contemplated by the settlement agreement incorporated into the final judgment).  The question in a case like this is whether and to what extent a court's continuing jurisdiction

- 11 -

to enforce a final judgment extends to claims for money damages for breaches of a settlement agreement that it incorporated into the final judgment and retained jurisdiction to enforce.

The leading case on the scope of a trial court's continuing jurisdiction to enforce a settlement agreement is the supreme court's decision in Paulucci. There, a plaintiff and a defendant in a civil action entered into a settlement agreement that required the defendant to maintain an existing approval or secure a new approval from regulators. 842 So. 2d at 799. The agreement specified that if the approval was not in place after fifteen months, the defendant would be required to make rental payments to the plaintiff in accord with a formula stated in the contract. Id. The trial court approved the settlement agreement and incorporated it into a final judgment that retained "jurisdiction . . . in order to enforce, construe, interpret, and otherwise ensure compliance" with it. Id.

The plaintiff later filed postjudgment motions in the trial court that heard the case alleging that the defendant failed to perform under the contract's regulatory-approval provisions. See id. at 800. The parties disputed "whether a remedy for the alleged breaches remains within the jurisdiction of the court which approved the settlement or must be brought as an independent action." Gen. Dynamics Corp. v. Paulucci, 797 So. 2d 18, 20 (Fla. 5th DCA 2001). Reversing a trial court order on the motions, the Fifth District held that the trial court lacked jurisdiction and certified a question concerning the extent of a trial court's jurisdiction to enforce a settlement agreement that the trial court has either incorporated into a final judgment or retained jurisdiction to enforce. Paulucci, 842 So. 2d at 798, 800.

The supreme court resolved that question as follows:

> [W]hen a court incorporates a settlement agreement into a final judgment or approves a settlement agreement by order and retains jurisdiction to enforce its terms, the court has the jurisdiction <u>to enforce the terms of the settlement agreement even if the terms are outside the scope of the remedy sought in the original pleadings.</u> However, the extent of the court's continuing jurisdiction to enforce the terms of the settlement agreement is circumscribed by the terms of that agreement. <u>Thus, if a party is claiming a breach of the agreement and is seeking general damages not specified in the agreement, the appropriate action would be to file a separate lawsuit.</u>

Id. at 803 (emphasis added) (footnote omitted). In sum, the court recognized a distinction between (1) a postjudgment proceeding to enforce the terms of a settlement agreement, which may be initiated upon motion in the trial court that approved the agreement and (2) a separate civil action for breach of the settlement agreement seeking general damages, which may only be initiated by the filing of a new lawsuit. See Id.

To distinguish proper postjudgment enforcement of a settlement agreement from a matter that must be brought in a separate action for breach, the court approvingly quoted from the Fifth District's analysis. Id. Under that analysis, when a court orders compliance with the terms of a settlement agreement—i.e., when it requires a party to perform an obligation stated in the agreement—it is engaged in proper postjudgment enforcement over which it has continuing jurisdiction. Id. (quoting Gen. Dynamics Corp., 797 So. 2d at 20). When a court awards damages as a substitute for a party's performance, however, it is not engaged in legitimate postjudgment enforcement but rather is considering a separate claim for breach. Id. at 803. Applying that distinction to the facts before it, the supreme court held that "the court approving the agreement had the authority to enforce [the] obligation to pay the stipulated rental . . . but that any action for damages under the general breach provision

- 13 -

(as opposed to enforcement of a duty accepted in the contract) would have to be instituted as a separate action."  Id. (quoting Gen. Dynamics Corp., 797 So. 2d at 20). That makes sense because the obligation to pay the stipulated rental was an obligation expressly stated in the settlement agreement, and the court could enforce that provision of the agreement by compelling the defendant to make those payments.  An obligation to pay damages for breach, in contrast, was not found in the agreement and constituted a separate claim that could only be maintained in a new lawsuit.

This distinction between compelling a party to perform an obligation stated in a settlement agreement and awarding general damages for breach would seem to resolve this case in the former husband's favor.  Apart from the requirement that the former husband pay additional equitable distribution in the event he failed to deliver the stock on time—an obligation the former husband fulfilled—the PSA did not specify a damage remedy for the delayed delivery of the stock.  Rather, the former wife sought and the family court awarded general, benefit-of-the-bargain damages for its breach using a specialized methodology—the Madison Fund rule—that is not specified in the PSA and that is not even the only way one might determine benefit-of-the-bargain damages in a case like this.  See, e.g., Shearson Loeb Rhoades, Inc. v. Medlin, 468 So. 2d 272, 273 (Fla. 4th DCA 1985) (explaining that contract damages for the delayed delivery of stock are determined as of the date of the breach).  Similarly, the family court awarded what amounted to general damages for breach of the tax-basis provision of the PSA in a sum that compensated her for her tax liability, a remedy also not specified in the agreement.  Couching these remedies as "enforcement" of the PSA does not change what their substance is: general damages for breach.  In view of the lines Paulucci draws between proper postjudgment motions to enforce and separate civil

actions, the family court lacked jurisdiction to make the money damages awards that it did here. See also W.C. Riviera Partners, LC. v. W.C.R.P., LC., 912 So. 2d 587, 589 (Fla. 2d DCA 2005) (holding that the trial court lacked jurisdiction to consider a postjudgment motion to "enforce" a settlement agreement that sought "damages . . . incurred as a result of alleged breaches" of an escrow agreement entered into in connection with a settlement); Rocha, 35 So. 3d at 976 (holding that a family court lacked continuing jurisdiction to grant relief not contemplated under a marital settlement agreement).

The family court concluded and the former wife argues on appeal, however, that paragraph 7A of the PSA—governing remedies in the event of a default on the stock-delivery provisions of paragraph 6—and paragraph 20 of the PSA, which speaks to remedies more generally, authorized her to seek the relief she did in the family court and, by extension, granted the family court continuing jurisdiction over her delayed-delivery and tax-basis claims. We turn to those arguments now.[2]

_____

[2]The former wife's arguments may to some extent be read as saying that a court that retains jurisdiction to enforce a settlement agreement has continuing jurisdiction to award general damages for its breach if the settlement agreement says it has such jurisdiction. It is not clear to us that Paulucci is properly read as extending that far, as distinguished from saying only that a court has continuing jurisdiction to award monetary remedies that are specifically stated in the agreement. And the answer may hinge, in part, on whether continuing jurisdiction, and Paulucci's explanation of its application to monetary remedies, is a close cousin of subject matter jurisdiction in that it goes to a court's power to decide a dispute involving a settlement agreement and cannot be expanded by the parties' agreement. See 14302 Marina San Pablo Place SPE, LLC, 92 So. 3d at 320-21, 321 n.3 (Ray, J., concurring) (noting that the First District has held that failures of continuing jurisdiction are not waivable and render judicial action without it void, while arguing that they should merely render the judicial action voidable); cf. Dandar v. Church of Scientology Flag Serv. Org., 190 So. 3d 1100, 1103 (Fla. 2d DCA 2016) (discussing a trial court's jurisdiction after the parties have settled a matter and filed a stipulation of dismissal under Florida Rule of Civil Procedure 1.420(a) instead of having the court approve the agreement and retain jurisdiction to enforce it). This is not an issue that, as near as we can tell, either the supreme court or

- 15 -

### *Paragraphs 7A and 20 Did Not Authorize the Family Court to Award General Damages for the Delayed Delivery of Stock*

The former wife's arguments require that we interpret paragraphs 7A and 20 of the PSA. Because we interpret a settlement agreement in a dissolution proceeding the same way we interpret any other contract, we use the standard rules of contract interpretation to do this work. See Rector v. Rector, 264 So. 3d 282, 286 (Fla. 2d DCA 2019) (citing Hobus v. Crandall, 972 So. 2d 867, 869 (Fla. 2d DCA 2007)). That means that we look first to the ordinary meaning of the language of the contract and, where that language is unambiguous, we will ordinarily construe the contract as the parties wrote it. See Murley v. Wiedamann, 25 So. 3d 27, 29-30 (Fla. 2d DCA 2009); Gulf Oil Corp. v. Atl. Coast Line R.R., 196 So. 2d 456, 457 (Fla. 2d DCA 1967). Where the contract is ambiguous in the sense that its text can reasonably be understood as meaning more than one thing, further construction is required. See Murley, 25 So. 3d at 29-30; see also Price v. Castle Key Indem. Co., 152 So. 3d 2, 3 (Fla. 2d DCA 2014). We may consider parol evidence only when the contract contains a latent ambiguity—i.e., where the contract language suggests a single meaning, but "some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." Mac-Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC, 915 So. 2d 657, 659 (Fla. 2d DCA 2005) (quoting Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So. 2d 544, 547 (Fla. 1st DCA 1974)).

---

our own has addressed. We need not address it here—and our opinion should not be read as having addressed it—because, assuming for argument's sake that that parties can by contract confer upon a court continuing jurisdiction to award general damages in a postjudgment enforcement proceeding, the PSA here does not do so for the reasons we explain in the text.

In the former wife's column, paragraph 7A of the PSA clearly permitted her to seek a "money judgment" or "any other remedy at law or in equity" in a postjudgment proceeding in the family court based on the former husband's failure to timely deliver the stock as required by paragraph 6A. And no one disagrees that this language is broad enough to encompass a claim for general damages for a breach. But paragraph 7A also conditions the former wife's right to seek that remedy through a postjudgment proceeding in the family court—as distinguished from the independent civil action that <u>Paulucci</u> would require—on the occurrence of specific circumstances. As described above, paragraph 7A provides that the former wife could seek the remedy of contempt, a money judgment, or any other legal or equitable remedy for the delayed delivery of stock in the family court on or after May 1, 2012, "<u>should Husband fail to fully comply with paragraph 6A above with regard to all 23 million Shares <u>on or before the close of business 5:00 p.m. EST on May 1, 2012.</u>"[3] (Emphasis added.) Nothing about the text of this provision or the facts of this case implies that this provision carries anything but one meaning: that is, that the former wife could seek money damages in postjudgment proceeding in the family court <u>if</u> the former husband failed to deliver all twenty-three-million shares of stock on or before May 1, 2012—i.e., "should" the former husband "fail to fully comply" with that obligation on or before May 1, 2012. <u>See</u> *Should*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/should (last visited Oct. 18, 2019) (defining "should," in relevant part, as a verb "used in auxiliary function to express condition").

---

[3]This provision was applicable in circumstances where the former husband had complied with his obligation to make the additional equitable distribution payments pursuant to paragraph 7A of the PSA, as was the case here.

The facts here do not present those circumstances. On the contrary, the former husband delivered all twenty-three-million shares to the former wife by March 1, 2012. Because all of the shares had been delivered on or before close of business May 1, 2012—two months before, in point of fact—the former wife was not authorized under paragraph 7A to commence a postjudgment proceeding in family court seeking money damages for breach of the former husband's obligation to deliver the stock timely. The family court was thus without continuing jurisdiction to consider it.

The former wife argues that notwithstanding the former husband's delivery of all twenty-three-million shares before May 1, 2012, we should interpret the PSA to allow her to bring her claim for delayed-delivery damages in a postjudgment proceeding in the family court because (1) paragraph 7A provides that nothing in the PSA "shall be construed to limit or restrict" her right to "seek or pursue" any legal or equitable remedies to "enforce her rights to receive the 23 million Shares and/or the value thereof" and (2) paragraph 20 allows "[e]ach party . . . to enforce and/or defend" the agreement using all legal and equitable remedies. The problem, however, is that if we interpret these provisions as the former wife argues, we would necessarily read paragraph 7A's provision that the former wife may seek those remedies in a postjudgment proceeding in the family court <u>if the former husband failed to deliver all of the stock on or before May 1, 2012</u> out of the contract. Put differently, if paragraphs 7A and 20 mean that the former wife could seek in a postjudgment proceeding in the family court whatever legal or equitable remedy she wanted whenever she wanted to seek it,

then paragraph 7A's condition—tying her right to do so to the former husband's failure to deliver all of the stock on or before May 1, 2012—serves no purpose.[4]

When we interpret a contract, we cannot do so in a way that renders a provision meaningless so long as there is a reasonable interpretation of the contract that avoids that result. See Wells v. Wells, 239 So. 3d 179, 181 (Fla. 2d DCA 2018) ("However, courts 'will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that does not do so.' " (quoting Moore v. State Farm Mut. Auto. Ins. Co., 916 So. 2d 871, 877 (Fla. 2d DCA 2005))). The remedial provision of paragraph 7A is reasonably understood as neither "restricting" nor "limiting" the former wife's rights to seek or pursue a claim for general damages. A party to a settlement agreement has a right to bring an independent action for general damages for its breach consistent with the terms of the contract and applicable law. And nothing in paragraph 7A's May 1, 2012 condition restricts or limits the former wife's right to bring an independent action for breach. Conversely, a party does not have a right to seek damages for breach of a settlement agreement in a postjudgment proceeding in the court that approved the settlement unless the settlement agreement specifies that remedy. See Paulucci, 842 So. 2d at 803; W.C. Riviera, 912 So. 2d at 589. The PSA in this case does not provide a claim for general

_____

[4]The former wife argues that it serves the purpose of establishing the circumstances under which the former wife could pursue a contempt remedy from the family court. But if that was all the provision was supposed to accomplish, paragraph 7A's provision that she could also seek "legal remedies" and a "money judgment" in the family court in the event that the former husband failed to deliver all of the stock by May 1, 2012, is surplusage. Read as a whole, paragraph 7A is most naturally interpreted as meaning that the former wife's ability to seek legal and equitable remedies in the family court, as distinguished from an independent civil action, arose if the former husband failed to comply with his obligation to deliver the stock on or before May 1, 2012.

damages for delayed delivery to be litigated in a postjudgment proceeding in the family court unless the former husband failed to deliver the stock on or before May 1, 2012. Because the former husband did deliver the stock by then, the former wife has no right to seek general damages for delayed delivery in a postjudgment proceeding in the family court that can be "limited" or "restricted."

Nor does the fact that paragraph 7A refers to the use of legal or equitable remedies to "enforce" the former wife's right to the shares or their value mean that she could seek general damages not specified in the PSA in a postjudgment enforcement proceeding. To make paragraph 20 carry that meaning, we would need to interpret the term "enforce" as including an entitlement to pursue the specified remedies in postjudgment proceedings in the family court. But neither the former wife nor the trial court identified anything in the text of paragraph 7A or the ordinary meaning of the term "enforce" to suggest that it carries that specialized meaning; nor is one apparent to us. As Paulucci holds, the enforcement of a settlement agreement in a postjudgment proceeding in the court that approved it does not include seeking general damages not specified in the agreement.

Simply put, applying the May 1, 2012 condition of paragraph 7A in accord with its unambiguous terms does not limit or restrict any right the former wife has to seek or pursue any legal or equitable remedy to which she may be entitled; she is always free to pursue those remedies in an independent action. Rather, interpreting paragraph 7A as written denies the former wife a unique entitlement enjoyed by no other litigant aggrieved by a breach of a court-approved settlement agreement to pursue those claims in a postjudgment proceeding in the absence of any legal or contractual

- 20 -

basis for the court's exercise of continuing jurisdiction.  This interpretation is, in our view, the only reasonable understanding of the plain language of paragraph 7A.

For substantially the same reasons, paragraph 20's provision that the former wife may "enforce or defend" the agreement using all legal, equitable, and contract remedies is not reasonably read as granting her a unique entitlement to litigate a claim for general damages for breach of the PSA in a postjudgment proceeding in the family court.[5]  Rather, paragraph 20 is reasonably understood as entitling the former wife a right to use all legal, equitable, and contractual remedies available to her but not to seek general damages for delayed delivery not specified in the agreement in postjudgment proceedings in the family court in circumstances where the former husband has delivered all of the stock on or before May 1, 2012.  This interpretation gives effect to paragraph 7A's provisions concerning the possible failure of the former husband to deliver all of the stock by May 1, 2012, while simultaneously giving effect to paragraph 20's enforcement provision.

We respectfully disagree with the former wife that Kinser v. Crum, 823 So. 2d 826 (Fla. 1st DCA 2002), and Buckley Towers Condominium, Inc. v. Buchwald, 321 So. 2d 628 (Fla. 3d DCA 1975), which she says Paulucci approved, support the proposition that provisions similar to those in paragraph 20 justify the family court's exercise of continuing jurisdiction to award money damages here.  In Kinser, the First District held that a court that had approved a settlement agreement had jurisdiction to

_____

[5]Indeed, paragraph 20's statement that "[s]o long as [one of the parties] continues to reside in the State of Florida, the courts of the State of Florida shall retain jurisdiction for purposes of enforcing this Agreement and that venue will lie in the county where the Florida resident then resides" would tend to suggest that they contemplated potential proceedings in Florida courts other than the family court.

render award of damages "pursuant to a mathematical calculation contained in the settlement agreement" in a postjudgment enforcement proceeding. 823 So. 2d at 827. And although Buckley Towers is not entirely clear, there the Third District appears to have held that a court that had approved a settlement agreement had jurisdiction to compel a party to that agreement to pay rent that it was required to pay under the agreement. See 321 So. 2d at 628. In each case, then, the court was compelling the payment of money that a settlement agreement specifically required to be paid—the payment of contractually specified damages in one case and the payment of contractually specified rents in the other—which is precisely what Paulucci says that a court reserving jurisdiction to enforce a settlement agreement has continuing jurisdiction to do. Neither case supports the proposition that provisions like those in paragraph 20 grant a court continuing jurisdiction to award general damages specified nowhere in the agreement.

Finally, although the former wife contends that the PSA is unambiguous such that parol evidence would not be admissible, she also argues that parol evidence admitted without objection from the former husband showed that the parties could not agree on a remedy for failure to timely deliver the stock and that the payment of additional equitable distribution under paragraph 7A was intended as periodic support during the time that the former husband was in default for failing to timely deliver the stock rather than an exclusive remedy for such a default, so long as the former husband delivered the stock by May 1, 2012. See Ross v. Fla. Sun Life Ins. Co., 124 So. 2d 892, 895-96 (Fla. 2d DCA 1960) (holding that a party who fails to object to the introduction of parol evidence in the trial court cannot invoke the parol evidence rule on appeal); see also King v. Bray, 867 So. 2d 1224, 1226 (Fla. 5th DCA 2004) (same). If she is right

- 22 -

about that, the parol evidence might have a bearing on the parties' dispute over whether the former husband's delivery of the stock before May 1, 2012 fully cured his failure to deliver it on January 27, 2012—thus implying that the payment of additional equitable distribution would be the former wife's exclusive remedy in this circumstance. But whether or not the parties intended the payment of additional equitable distribution as an exclusive remedy in the event of full delivery on or before May 1, 2012 does not bear at all on the family court's continuing jurisdiction to consider a claim for general damages for breach of the former husband's obligation to deliver the shares timely. Regardless of whether the agreement allows the former wife the substantive right to pursue a general damages remedy for delayed delivery of the stock when complete delivery was made by May 1, 2012 (a matter we do not decide), the law concerning continuing jurisdiction and the language of the parties' agreement shows that a claim for that remedy (if it exists) can only be pursued by way of an independent action.

### *Paragraph 20 of the PSA Does Not Authorize the Family Court to Award General Damages for the Provision of Inaccurate Tax Information*

Because paragraph 7A relates solely to the former husband's failure to timely deliver the stock, the only provision of the PSA that might enable the court to fashion relief on the tax-basis claim is paragraph 20. The tax-basis claim is, like the delayed-delivery claim, in essence and effect a claim for general damages for breach of contract—i.e., it is a claim the former husband failed to deliver accurate tax information and the former wife suffered losses in the form of a required tax payment as a result. The family court's judgment treats the tax-basis claim in this way. For the same reasons that apply to the delayed-delivery claim, then, paragraph 20 did not provide the family court with any basis to consider a postjudgment-damages claim for breach of the

tax-basis provision of the PSA.[6]  The trial court lacked continuing jurisdiction to afford this remedy as well, and the former wife is required to pursue it by way of independent action.

### *Conclusion*

For the foregoing reasons, we reverse the monetary awards contained in the amended final judgment as well as the asset freeze injunction that the family court awarded to secure their payment.  In all other respects, the amended final judgment is affirmed.  We remand the case to the family court for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; remanded.

CASANUEVA and VILLANTI, JJ., Concur.

---

[6]The former wife has asserted what amounts to a tipsy-coachman argument that an indemnification provision in paragraph 15 of the agreement provides a specific contractual remedy for the former husband's breach of the tax-basis provision of paragraph 15 and thus supports the family court's exercise of continuing jurisdiction over that claim.  See Dade Cty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 644 (Fla. 1999) (stating that under the tipsy-coachman rule, "if a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record").  The former wife did not, however, allege a claim for contractual indemnification under paragraph 15 in her petitions or litigate that claim in her pretrial papers or at trial.  The question of whether and to what extent the indemnification provision of paragraph 15 entitles the former wife to indemnification on the facts here has not been developed in the trial record, and we decline to reach the issue for the first time on appeal.  Cf. HSBC Bank USA, Nat'l Ass'n for Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2007-OA5 v. Nelson, 246 So. 3d 486, 489 (Fla. 2d DCA 2018) (refusing to address a tipsy-coachman argument for affirmance of a summary judgment where the trial court explicitly declined to address the argument and it would be "inappropriate" for the appellate court to do so in the first instance); Salazar v. Hometeam Pest Def., Inc., 230 So. 3d 619, 622 (Fla. 2d DCA 2017) ("Correspondingly, 'we cannot employ the tipsy coachman rule where a lower court has not made factual findings on an issue and it would be inappropriate for an appellate court to do so.' " (quoting Bueno v. Workman, 20 So. 3d 993, 998 (Fla. 2d DCA 2009))).